Upon review of all of the competent evidence of record with reference to the errors assigned, and finding good grounds to reconsider the evidence, the Full Commission REVERSES the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award:
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in the Pre-trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are subject to and bound by the North Carolina Workers' Compensation Act and are properly before the Commission.
2. CNA Insurance Companies provided coverage under the Workers' Compensation Act for employer Pony Express Courier.
3. Plaintiff-employee was involved in a motor vehicle accident arising out of and in the course of her employment with defendant-employer on November 22, 1991.
4. Plaintiff's average weekly wage at the time of the compensable accident was $225.00, yielding a weekly compensation rate of $150.00.
5. A Form 19 was filed on December 3, 1991.
6. A Form 21 dated December 13, 1991, was approved by the Commission on January 28, 1992.
7. Plaintiff-employee was paid temporary total disability benefits from November 23, 1991 until approximately January 10, 1992, at which time defendant-employer stopped paying any benefits. The exact date the carrier stopped paying benefits is subject to modification.
8. A Form 33 was filed on April 20, 1995.
9. A Form 33R was filed on June 1, 1995.
10. Plaintiff was cared for and treated at Pender Memorial Hospital, Medico Urgent Care Clinic, Physical Therapy Services of Wilmington, Northside Medical Center, Wilmington Orthopaedic Group and UNC Hospitals, and the medical records of all these providers may be received into evidence.
 ***********
Based upon the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is a female who was 48 years of age at the time of the hearing before the deputy commissioner. She completed the 12th grade. Prior to her admittedly compensable injury by accident on November 22, 1991, plaintiff had worked for defendant-employer for about eleven years.
2. Prior to and on November 22, 1991, plaintiff performed the job duties of a lead courier for defendant. Her primary responsibility involved covering the office where she spent more than half of her time. Her office duties included assisting with the unloading of trucks and placing packages in the storage area. She was expected to lift packages weighing up to 70 pounds and be able to "maneuver" at least 90 pounds. She would also work outside the office as a courier delivering packages as needed.
3. On November 22, 1991 plaintiff was injured in a motor vehicular accident while training a new driver. Plaintiff was a passenger in a Pony Express truck driven by an employee-trainee. The employee-trainee lost control of the vehicle on a wet highway causing the vehicle to overturn and land in a ravine.
4. Following the accident, plaintiff was transported to Pender Memorial Hospital for treatment for her injuries. Plaintiff later sought treatment at Medico Urgent Care, the medical provider where Pony Express referred their employees. Plaintiff's primary complaints at the hospital and at Medico were of back, neck, shoulder, left knee and left foot pain. The hospital x-rays revealed no evidence of fractures, but minimal hypertropic spur formation of the bodies of C6 and C7 were noted. The plaintiff was given pain medication and muscle relaxants and taken out of work. She was also referred to physical therapy.
5. The defendants admitted liability for plaintiff's injury by accident and the parties entered into an I.C. Form 21 agreement for payment of compensation. Plaintiff began receiving weekly compensation for temporary total disability for "necessary weeks" on December 13, 1991. The Form 21 agreement was filed with the Industrial Commission on January 21, 1992 and approved by the Commission on January 28, 1992.
6. Defendant-carrier, without approval from the Industrial Commission, stopped paying compensation to plaintiff on or about January 27, 1992. Bonnie Foster, the claims adjuster, noted in her file that she stopped temporary total disability compensation until plaintiff called. Plaintiff tried to contact defendant-carrier at least three times after January 27, 1992, but was unable to reach Bonnie Foster, the person handling her claim. Plaintiff also called her employer and informed Harold Mills, her supervisor, that her check had been cut off. He was not aware that checks had been stopped and gave plaintiff the telephone number for defendant-carrier. Plaintiff called the number given to her several times and left messages for someone to return her call, but she never received a call. The persons plaintiff spoke with were not able to tell her why her checks had been stopped. Plaintiff did not have a working telephone at home at the time. Defendant-carrier had plaintiff's address and plaintiff had previously responded to a "call me" card from defendant-carrier.
7. Harold Mills knew how to reach plaintiff because he arranged for plaintiff to personally sign the Form 21 agreement and receive her first workers' compensation check. Harold Mills' testimony that he couldn't reach plaintiff is not accepted as credible. There is no evidence that Harold Mills or anyone from defendant-employer wrote plaintiff a letter to inquire about plaintiff's return to work status, to check on her medical status, or for any other reason. Harold Mills testified that he had no more involvement in plaintiff's case, after he referred the case to defendant-carrier, except to arrange for her to sign the Form 21 agreement. Harold Mills retired in April, 1992.
8. There is no evidence that defendant-employer made any effort to monitor plaintiff's progress or to offer her a suitable job after unilaterally terminating her compensation.
9. Defendant-carrier closed plaintiff's file in June, 1992, stating as the reason for closure that they had not had any contact with plaintiff in six months. There is no evidence that defendant-carrier tried to contact plaintiff prior to closing her file.
10. Defendant-carrier knew where plaintiff lived because plaintiff was contacted personally by Thomas R. Cook, a claims investigator, hired by defendant-carrier on January 2, 1992. According to Thomas R. Cook's Claim Investigation report (from Continental National American Group) which is a part of defendant-carrier's claims file, Thomas Cook talked to plaintiff, apparently at her home on January 2, 1992. Plaintiff informed him at that time that she had no idea when she might be able to return to work and that she was waiting to see an orthopedic specialist for further examination and treatment. The investigation was initiated by Bonnie Foster, the adjuster on plaintiff's claim.
11. Plaintiff called Bonnie Foster on December 9, 1991 after receipt of a "call me" card in the mail and Ms. Foster obtained plaintiff's recorded statement on December 11, 1991. On January 17, 1992 Bonnie Foster wrote a note to the file stating plaintiff was still out of work and she needed to follow up for return to work, light duty and maximum medical improvement. On January 21, 1992 Bonnie Foster wrote a note to the file that she called insured (defendant-employer), that plaintiff had not kept in touch and that she was unsure which orthopedist plaintiff was seeing. Bonnie Foster further noted that a "call me" card was sent to plaintiff to determine current medical status and that she would follow-up in two weeks and assign rehabilitation services to the case at that time. Defendant-carrier never did assign rehabilitation services to the case and unilaterally terminated plaintiff's compensation one week later, on or about January 27, 1992.
12. Between January, 1992 and June, 1992 defendant-carrier transferred plaintiff's file from Bonnie Foster to Jean Ellison. On June 17, 1992 Jean Ellison called the workers' compensation administrator for defendant-employer, and according to the note in the file, she was advised that they had not had any contact with plaintiff since December, 1991. Defendant-employer's workers' compensation administrator was located in their Winston-Salem office. Jean Ellison closed defendant-carrier's file at that time, without making any attempt to write or otherwise contact plaintiff.
13. Defendant-carrier was aware that plaintiff had not returned to work at least by October 5, 1992. Plaintiff's attorney sent a letter to Jean Ellison dated August, 1992 giving notice of his representation of plaintiff and requesting file documents under Industrial Commission Rules 605, 607 and 608. Plaintiff's attorney called Jean Ellison on October 5, 1992, and advised that plaintiff was still out of work. Plaintiff's attorney sent a demand letter to defendant carrier on January 19, 1993 demanding payment of temporary total disability benefits from the cut off date in January, 1992 and continuing as plaintiff was still out of work.
14. Defendant-carrier did nothing to arrange for continued medical treatment for plaintiff or to reinstate compensation. Defendant-employer has never assisted plaintiff in obtaining medical care. Plaintiff sought treatment at Medico after she was released from emergency room care at the hospital because she knew this was where the company required her to go. Plaintiff was treated by Dr. Sue Nelson. Plaintiff participated in physical therapy at Physical Therapy Services of Wilmington upon referral from Dr. Nelson, until she decided that the therapy was making her worse. Her last visit was December 18, 1991.
15. On December 10, 1991 a physician's note from Medico indicated that plaintiff could return to work at light duty with restrictions to not drive or lift or use her shoulders. At that time plaintiff was still in physical therapy. Plaintiff did not receive a copy of the return to work note, but she was told of her release to light duty by the doctor. She informed her supervisor of her release to work and her restrictions. Plaintiff's supervisor advised her that no light duty work was available.
16. Plaintiff did not seek medical care during the first half of 1992 because she did not have the money to pay for medical care; her compensation had been terminated and her attempts to contact defendant-carrier were unsuccessful. Relatives had to assist with providing money for treatment.
17. Dr. Mark D. Foster, an expert in orthopedic surgery, began treating plaintiff on August 24, 1992. Plaintiff presented with complaints of neck, shoulder and left leg pain. Plaintiff gave a history of the onset of said pain resulting from a motor vehicle accident on November 21, 1991. Dr. Foster treated plaintiff for her shoulder problem only and diagnosed probable muscle strain and contusion involving her left trapezius and left latissimus. At plaintiff's follow-up visit on October 8, 1992 Dr. Foster advised plaintiff that he did not have anything further to offer her in terms of making her well given the protracted nature of her problem. He stated that plaintiff could return to work as a courier for Pony Express and he rated her with a zero percent permanent partial impairment of the left shoulder. Dr. Foster did not examine plaintiff's back, neck or leg even though she complained of pain in these areas also.
18. Plaintiff sought treatment with Dr. James H. Prigden, a specialist in internal medicine on January 27, 1993. Plaintiff presented with a swollen left hand, pain on palpation of the left chest area, pain on palpation of the left medial scapular edge, and pain of the left wrist. Plaintiff's left hand strength was diminished and she expressed pain as she attempted hand grip. She also had pain on the left side of the cervical spine and left side of the neck; she could not turn her head completely to the left.
19. At plaintiff's February 10, 1993 medical examination, Dr. Pridgen's examination findings showed plaintiff's symptoms had improved. At plaintiff's March 15, 1993 visit, plaintiff saw another doctor at the medical center who noted that the muscles in plaintiff's left shoulder were swollen and sometimes ached badly. Plaintiff continued to have tight muscles and tenderness about the shoulder.
20. Dr. Pridgen was of the opinion that as of February 10, 1993 plaintiff was going to have chronic, intermittent pain and that she would be able to work when she was not having pain, but it would probably be very difficult for her to maintain any type of gainful employment. Dr. Pridgen was of the opinion that the problems for which he treated plaintiff were a direct result of her motor vehicle accident on November 22, 1991 and that her intermittent pain problems were chronic and permanent. Plaintiff returned to Dr. Pridgen on October 25, 1995 with continued shoulder pain.
21. Plaintiff's claim remained open after defendants unilaterally terminated plaintiff's compensation in January, 1992 without approval from the Industrial Commission. Plaintiff's claim is not barred by N.C. Gen. Stat. § 97-47 or by the doctrine of laches. No I.C. Form 28B report was filed with the Industrial Commission until March 12, 1996. The Form 28B report stated that plaintiff's case was not closed.
22. Defendant-carrier's unilateral termination of plaintiff's workers' compensation benefits and further closure of their case file caused unreasonable delay in plaintiff receiving the medical treatment she needed and delay in clarifying plaintiff's ability to return to work. Defendant-carrier received medical bills for plaintiff's treatment with Dr. Foster, but did not pay these bills until 1996 when Dr. Foster refused to perform a medical evaluation requested by defendant-carrier due to plaintiff's outstanding balance.
23. Defendant-carrier waited until March 15, 1996 to seek a medical evaluation of plaintiff to determine her physical restrictions resulting from her compensable injury even though they admit that they were aware by October, 1992 that plaintiff had not returned to work and that she was contending that she was still unable to work due to her work-related injury.
24. In February or March 1996, defendant-carrier agreed to pay plaintiff's outstanding bills for prior treatment with Dr. Foster after they finally reviewed the bills and determined that the treatment provided did relate to plaintiff's compensable injury. By that time, some of the bills had been in the carrier's possession for over three years.
25. On June 4, 1996 Dr. Foster re-evaluated plaintiff at the request of defendant and rated plaintiff with a 2% permanent partial impairment to her left shoulder based upon "tenderness about the trapezius, biceps tendon, subacromial space and stiffness in terms of her range of motion from about 160 to 170 degrees of abduction." He gave her the following restrictions: "She should not do repeated overhead activity, heavy lifting, and repeated pushing and pulling." He also noted that assuming plaintiff could find employment that met these restrictions, there would be no orthopaedic reason to prevent her from returning to work.
26. Plaintiff's chronic left shoulder, arm, leg, hand and neck problems were caused by her admittedly compensable motor vehicle accident of November 22, 1991.
27. At the time of the hearing before the deputy commissioner, plaintiff still complained of left arm numbness, pain radiating from the neck down her left arm, and loss of gripping strength.
28. As a result of her motor vehicle accident of November 22, 1991, plaintiff has been incapable of earning wages in the same or any other employment from the date of injury through the date of hearing before the deputy commissioner and continuing.
29. Plaintiff has a presumption of continuing disability based upon the I.C. Form 21 agreement approved by the Commission.
30. Defendants have not rebutted plaintiff's presumption of continuing disability by showing that plaintiff is capable of earning wages in the same or any other employment. Defendants have not provided vocational rehabilitation for plaintiff; offered plaintiff suitable employment or shown that there are jobs available in the competitive marketplace that plaintiff could get with her physical condition and limitations.
31. Plaintiff's average weekly wage at the time of injury was $250.87 based upon the earnings history provided by defendant-employer. Stipulation number 4 is not supported by the evidence and is therefore given no weight. It appears to be based upon a Form 21 agreement where the average weekly wage was "subject to verification." Average weekly wage is a question of law.
32. An approved I.C. Form 21 is an award of the Industrial Commission and plaintiff is entitled to interest on the award from the date compensation was stopped without the approval of the Industrial Commission.
33. Defendant's action in terminating plaintiff's compensation without Industrial Commission approval caused the plaintiff to have to retain an attorney to prosecute her claim. Plaintiff is entitled to attorney's fees from defendants.
 ***********
Based on the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On November 22, 1991, plaintiff sustained an admittedly compensable injury by accident arising out of and in the course of her employment with defendant-employer when she was injured in a motor vehicle accident while training an employee-trainee. N.C. Gen. Stat. § 97-2(6).
2. As a result of her injury by accident on November 22, 1991, plaintiff sustained injuries to her neck and left shoulder, arm, hand and leg. N.C. Gen. Stat. § 97-2(9).
3. Plaintiff has been incapable of earning wages in the same or any other employment from the date of injury on November 22, 1991 through the date of hearing before the deputy commissioner and continuing.
4. For her compensable injuries, plaintiff is entitled to have defendants pay temporary total disability compensation at the rate of $167.25 per week from November 23, 1991 through the date of hearing before the deputy commissioner and thereafter continuing until further order of the Industrial Commission. Defendant is entitled to a credit for disability compensation already paid to plaintiff.
5. Defendants are responsible for payment of all medical expenses incurred or to be incurred by plaintiff as a result of her November 22, 1991 injury by accident for treatment which was or which may be reasonably necessary to effect a cure, give relief, or lessen any period of disability. N.C. Gen. Stat. § 97-2(19), 97-25.
6. Defendants' agreement to pay compensation for "necessary" weeks under the I.C. Form 21 agreement approved by the Commission on January 28, 1992, created a presumption of ongoing disability.Watkins v. Central Motor Lines, Inc., 279 N.C. 132,181 S.E.2d 588 (1971); Kisiah v. W. R. Kisiah Plumbing,Inc., 124 N.C. App. 72, 476 S.E.2d 434 (1996).
7. Defendants declined to offer plaintiff suitable light duty employment at the time she was initially released to light duty on December 11, 1991. Defendants have failed to offer plaintiff suitable employment at any time since November 22, 1991. Defendants have failed to establish that plaintiff had wage earning capacity at the time they terminated her benefits in January, 1992 or at any time thereafter and thus defendants have failed to rebut plaintiff's presumption of continuing disability.Kisiah v. W. R. Kisiah Plumbing, Inc., 124 N.C. App. 72,476 S.E.2d 434 (1996).
8. Plaintiff is entitled to interest at the legal rate of eight percent (8%) on all compensation due since compensation was terminated on or about January 27, 1992. N.C. Gen. Stat. §97-86.2.
9. Plaintiff is entitled to attorney's fees from the defendants as a result of defendant's conduct in terminating benefits without Industrial Commission approval. N.C. Gen. Stat. §97-18; I.C. Rule 802.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay the plaintiff temporary total disability compensation at the rate of $167.25 per week from November 23, 1991 through the date of hearing before the deputy commissioner and continuing until further order of the Industrial Commission. Such benefits as have accrued shall be paid in a lump sum. Defendants shall be given a credit for compensation already paid to plaintiff.
2. Defendants shall pay plaintiff interest at the legal rate of eight percent (8%) on all past due compensation since January 27, 1992.
3. Defendant shall pay all medical expenses incurred or to be incurred in the future by the plaintiff as a result of her compensable injuries for so long as such examinations, evaluations and treatments tend to effect a cure, give relief, or lessen the plaintiff's period of disability when bills for same have been submitted and approved through procedures adopted by the Industrial Commission.
4. A reasonable attorney's fee of twenty-five percent of the compensation due plaintiff under paragraph one this Award is approved for plaintiff's counsel. Defendants shall pay directly to plaintiff's attorney as an attorney's fee an amount equal to twenty-five (25%) of the accrued compensation due plaintiff at the time of filing this Opinion and Award; this attorney's fee is in addition to and shall not be deducted from the amount due plaintiff. Plaintiff is responsible for attorney's fees on any future compensation due under this award after the filing of this Opinion and Award which shall be paid as follows: every fourth compensation check due the plaintiff shall be deducted and forwarded directly to plaintiff's attorney.
5. Defendants shall pay the costs.
 S/ ___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/ ________________ J. HOWARD BUNN, Jr. CHAIRMAN
S/ ________________ LAURA K. MAVRETIC COMMISSIONER